## CHARLEY PUTTY v. THE STATE.

No. 15350.   Delivered November 2, 1932.
Rehearing Granted March 28, 1934.
State's Rehearing Denied May 9, 1934.

The opinion states the case.

*Oxford & McMillan,* of Stephenville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for theft of hogs; punishment, two years in the penitentiary.

Appellant went to the home of a former tenant of his, who will be called herein P, found him and his wife absent, and took away with him two hogs, for the theft of which he stand convicted. According to appellant's own testimony P owed him and had gotten a part of certain rent corn which had been put in a crib; that on a day mentioned he and P had measured the corn, and P then said he had gotten some of the corn; that the next day appellant went over to the house of P, found him not at home, loaded the two hogs in his wagon, told P's daughter to tell her father he had the hogs, and was going to hold them until P had a settlement with him. Appellant admitted that up to the time of this trial he had had no such settlement with P, and still had the hogs. Mrs. P testified that the hogs belonged to her, were her separate property,—but P testified that he gave his wife money out of the crop with which she bought said hogs. We think this cuts no figure here.

The trial court very definitely and plainly submitted to the jury in his charge the issue that appellant's guilt depended on his intent in taking the hogs. He charged as follows: "Although you may believe from the evidence in this case, beyond a reasonable doubt, that the defendant took the two hogs as alleged in the indictment, yet if you further believe from the evidence that at the time he took them, he did not intend to steal them, but only took them in order to bring about a settlement with R. H. Purdom and himself, and without any intention of permanently appropriating the hogs to his own use and benefit, then he would not be guilty of the theft of the same, and you will so find; or, if you have a reasonable doubt thereof, then you will give the defendant the benefit of such doubt, and find him not guilty." We believe this embraced every pertinent phase of the law

applicable which appears in appellant's special charges two to six inclusive. It submitted the affirmative defensive theory, and applied thereto, in a manner favorable to appellant, the doctrine of reasonable doubt. Appellant cites many authorities in his able brief. Smart v. State, 32 S. W. (2d) 197, was reversed for the refusal of a charge like that given in the instant case. This is true of Carroll v. State, 25 S. W. (2d) 345, and of most of the cases collated by Mr. Branch in section 2470 of his Annotated Penal Code. In Young v. State, 34 Texas Crim. Rep., 290, a similar charge was given and said case was affirmed. In Barton v. State, 88 Texas Crim. Rep., 368, we said that whether the use of force in obtaining money from another was in good faith or as a pretext to cover fraudulent intent,—was a question for the jury. We have no right to substitute our judgment for that of the jury on any question of fact, or proper inference from facts.

There can be no question of the harmful consequences to society which might easily flow from such acts as those of appellant in this case. He was demanding a settlement from a former tenant, which might include corn, money, labor or property of various kinds, etc. In such case he took property which he found at the tenant's home, and,—if we understand him,—intends to keep it until by such means he can compel the tenant to make a settlement with him. He kept it from the time of taking on January 6th, 1932, to that of this trial on January 27, 1932. He may still have it. In Dunn v. State, 34 Texas Crim. Rep., 257, where the claim was that the purpose of the taking was to get a reward for the return of a horse, we said: "It appears that the purpose here was not for a temporary use, but to hold the property itself until he should be paid for its restoration to the owner." It appearing that the issue was properly submitted in that case, the judgment was affirmed. The holding has been upheld. In Plemons v. State, 44 Texas Crim. Rep., 555, the facts showed that the accused signed his brother-in-law's name to a check wthout authority so to do, claiming that he had no intent to injure and defraud inasmuch as said party owed him and he thought by this means he could collect what was due. We held that this was no defense, differentiating the principle involved from that governing in theft cases only on the ground that in theft the intent was to injure the owner, but in forgery,—to injure the public. We are unable to bring ourselves to believe the evidence in this case wholly insufficient, and see nothing in the special charges except in an effort by

different verbiage to present what was already in the main charge.

Finding no error in the record, the judgment will be affirmed.

*Affirmed.*

## ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Either through inadvertence or by typographical error, we said in our original opinion that appellant "kept it (referring to hog he was charged wth stealing) from the time of taking in January, 1931, to that of the trial in 1932." It appears from the record that the taking was on January 6, 1932, and this trial was on January 27, 1932. The original opinion has been corrected to be in accord with the record.

It is appellant's contention that under the facts when viewed in the strongest light for the State he is not guilty of theft, and that the finding of the jury is in the face of the evidence under the defensive charge quoted in our original opinion.

Purdom was a tenant on appellant's place in 1931. Purdom had moved to another place about ten days before appellant took the hogs in question. The record leaves no doubt but that appellant and his former tenant were in a controversy about the rent. Purdom testified: "I suppose he and I were having some trouble about a settlement there, about the rents; and Mr. Putty claimed I got a load of his corn." He denied having gotten the corn and denied having admitted in the presence of appellant and other parties that he got it, although such admission was testified to by appellant and another witness. Appellant testified that three loads of rent corn were placed in his barn in September and that after Purdom moved from the place appellant noticed that some of the corn was missing; that at appellant's insistence Purdom came back to appellant's place and the rent corn was measured and fell one load short, and Purdom admitted that he would have to replace it, and said he got the corn, but would not further discuss a settlement of the matter, but left hurriedly; that appellant went the next day to see Purdom about the corn and was told by the latter's daughter that her father was not at home. It is gathered from appellant's testimony that he had some doubt about Purdom being away from home and thought he was avoiding a meeting to discuss a settlement. Appellant further testified that he told Purdom's daughter that he was going to get the pigs, and take them home and keep them until her father had a settlement about the corn, and for her to tell her father when he brought the corn back he

could have the pigs; that his purpose in hauling the pigs away "was to get a settlement, get his corn, that without taking the pigs he could not get to see Purdom, and that he thought if he took the pigs Purdom would come to see about the matter." Miss Vera Purdom testified that appellant came and got the pigs about four o'clock in the afternoon and took them in her presence. Her version of the incident is as follows: "* * * What the defendant here said he wanted to see my father about, he just asked where he was. He said he had come after his corn; come to get his corn. As to his claiming that my father owed him a load of corn, that is what he said; and had come to get it. My father wasn't there, and of course, I couldn't deliver him the corn. In regard to statement he made to me about, he believed my father was there in the house, he thought, maybe he was around the place somewhere; that is what he said. * * * The statement he made when he went to take the hogs, or did take them, he said he was taking the pigs in place of the corn. He was going to take the pigs in place of the corn. He never told me, that I heard, when my father paid him for the corn, he was ready to return the pigs. What he told me while he was leaving about that; I don't know what he said, he said something to me. I couldn't say that he did not tell me, because I don't know what he did say." Appellant took the hogs in broad open daylight, in the present of Miss Purdom, having a lady in the wagon with him at the time, and asked a man who was passing to help catch the hogs and put them in the wagon. The "taking" was not of that character usually found in theft cases. It seems no other conclusion from the evidence can be reached than that appellant took the hogs either in payment for the corn, or to hold them as security for such payment, and that no other conclusion finds support in the testimony. While the trespass committed by appellant in taking the hogs was outrageous, for which he would be answerable in another tribunal, yet if he took them for either of the purposes named, our court has held that the "fraudulent intent" necessary in the commission of every theft would be absent. Supporting his contention appellant cites a number of cases from our own court; most of them were reversed for failure to give an instruction similar to the one which was given in the present case. A short review of the cases may be interesting as containing expressions of this court touching the guilt or innocence of accused under facts similar to those here found.

In Williams v. State, 3 S. W., 226, accused was charged with theft of lumber from the trustees of a certain school commun-

ity. Appellant asked two special charges, as follows: "(1) If you believe from the evidence that defendant took the lumber he is charged with stealing, openly, and without any effort at concealment or intent to steal, he would not be guilty of theft. (2) If the defendant took and held the lumber he is charged with stealing in order to secure him in the payment of an indebtedness due him from the Brooklin community, he would not be guilty of theft." The court said that the two instructions requested were unquestionably the law.

In Young v. State, 30 S. W., 238, accused was convicted for the theft of a watch. It was his claim that the owner of the watch was indebted to accused in the sum of eight dollars and a half for labor and would not pay him; that he went to the owner's house and took the watch when no one was at home but that he called the attention of a negro woman who was in the yard washing to the fact that he had gotten the watch. The court gave a charge substantially like the one given in the present case. In affirming the judgment the court set out the evidence which sustained the conviction, as follows: "The evidence in this case amply sustains the verdict. There was no question as to the taking of the watch by defendant. This fact is even admitted by him in his defense, and he sought to justify it on the ground that the owner, Ousley, owed him at the time $8.50 for work that he had done for him, and that he took the watch to secure this debt. The existence of the debt was denied by Ousley; but conceding that the latter did owe defendant, in view of the fact that the debt was small in comparison with the property taken, and that although defendant went to Ousley's house a short time after taking the watch, and did not then inform him of the fact and afford him an opportunity to redeem it, and the fact that he made no effort to produce the negro woman at the trial to whom (by his testimony) he told, at the time of taking the watch, the purpose for which he took it,—all this, in connection with the proof that he traded the watch and chain, receiving therefor much more than his debt amounted to, and gave at the time fase statements as to how he acquired them, no doubt induced the jury to believe that the defense set up by appellant was a sham and a pretense."

Young v. State, 37 Texas Crim. Rep., 457, 36 S. W. 272, was reversed for the failure of the court to give a charge upon the defensive issue. In that case accused was charged with having stolen a plow stock. The testimony was uncontradicted that he took it at night without the owners' knowledge or consent. It was further without dispute that accused had been hauling

goods for the owners of the plow stock for a long while and that at the time the implement was taken the owners were indebted to the accused in the sum of $21. Appellant testified that at the time he took the stock it was his intention to allow therefor a credit on the amount which was due him. While the reversal was because of the failure to give a charge, the view of this court as expressed with reference to the matter is pertinent to the present case. It was said: "If he took the property, as he claimed, with no fraudulent intent, under the circumstances detailed by him, and with the intent to pay the owners for the same, in the settlement between the alleged owners and himself of the amount due him, and the jury believed this, he would be entitled to an acquittal."

Wolf v. State, 14 Texas App., 210, was tried before the court. The evidence shows that one Martin owed accused about eight dollars; that in Martin's absence accused went to Martin's place and with the assistance of an employe of Martin measured out and took off sixteen bushels of Martin's corn. The court found appellant guilty, although stating he concluded from the evidence that accused "took the corn in question to pay himself for what he considered the prosecuting witness owed him, without his consent and in his absence." The judgment of conviction was reversed, this court saying that however liable accused might be in trespass he was not guilty of theft, there being an absence of fraudulent intent at the time of the taking.

In Gray v. State, 91 Texas Crim. Rep., 484, 239 S. W., 953, the facts show that a boy about sixteen years old went to accused's store and sought to get change for a ten dollar bill. The father of the boy ran an account with accused and was owing him at the time. Accused kept the ten dollars, saying he would credit it upon the account. Accused sought to have the jury told that if the father was indebted to accused, and the ten dollars was applied to the account they should acquit. This court in passing upon the matter said, the charge ought to have been given because "if the facts were as outlined in the special charge, there was an absence of an intent to steal."

While this court hesitates to reverse upon the facts, yet it becomes its plain duty to do so when the verdict of guilt fails to find support in the evidence. It is plain that appellant was not well loved by his neighbors. It got into the record from one of them that he was "a contentious kind of a fellow, and had little bickerings and complains over little things;" another said that appellant "has a reputation that he is hard to get along with, and chinchy and contentious." These things, if true, and

appellant's conduct incident to the present case, would not commend him as a neighbor, and may shed some light on the jury's verdict, but such characteristics and conduct would not justify his condemnation as a thief.

We have reached the conclusion that appellant's motion for rehearing should be granted, the judgment of affirmance set aside, and the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

*Reversed and remanded.*

MORROW, Presiding Judge, (Concurring).—The evidence in this case is not regarded as presenting any conflict. In other words, it is not a case in which the jury's decision upon conflicting evidence is binding upon this court. It is a case in which the jury has drawn an unauthorized conclusion from the uncontroverted facts. The only conclusion tenable from the undisputed facts is regarded as that stated in the original opinion. For that reason and upon the citation of authorities contained therein, the writer feels constrained to concur in the opinion reversing the judgment.

LATTIMORE, Judge, (Dissenting).—I find myself wholly unable to agree to reverse this case for no other reason than that we are not satisfied with its facts. A jury has passed on the facts, and a fair district judge,—who saw and heard the witnesses testify,—has overruled the motion for new trial, and the record is not so devoid of evidence of guilt as to cause belief in a dispassionate mind that the verdict was the result of passion or prejudice.

Our Legislature wrote in article 706, C. C. P., that the jury, in all cases, are the exclusve judges of the facts, except in case it is by law provided that proof of a particular fact must be taken as conclusive of the existence of another fact, or it is by law provided that a certain weight is to be attached to certain evidence. Decisions almost without number uphold the doctrine of this statute, and its mandate is properly challenged only in cases where the testimony is so manifestly insufficient to sustain the verdict,—if believed,—as to make such verdict clearly wrong. The uniform holding is that this court only reverses on facts when they are either so slight as that we are forced to conclude that no unbiased person would be justified in concluding the accused guilty of the crime, or there is no testimony at all. These are statements of the law that are not subject to dispute, and are established by unbroken lines of decisions, as well as clear and fixed rules of law.

The case before us is one of theft. To make it out the facts must show that the accused fraudulently took property of Purdom from his possession without his consent, and with intent to appropriate it, and to derive Purdom of its value. Concretely stated, appellant took two hogs belonging to Purdom from his possession and without his consent. He took them without any sort of right so to do, without any claim of ownership, real, fancied, or mistaken, with full knowledge that they were Purdom's hogs, that they were at Purdom's house, that they were not trespassing on appellant's premises, and that he had no right, title or interest whatever in said hogs. He took them with intent to deprive Purdom of said hogs, except on certain contingencies. To use appellant's own language on the witness stand on this trial: "I was going to take the shoats on home with me, and when he brought the corn back, and come over and settled with me, he could have the shoats." Expressio unius est exclusio alterius, hence appellant testified as plain as words could say that he intended to appropriate said hogs unless Purdom brought back to appellant certain rent corn, which Purdom claimed had been fed to appellant's own stock, and which appellant claimed had disappeared from the barn in which certain loads of rent corn had been put. As stated above, appellant did not set up any interest in or right to said hogs. There was no disputed question of ownership. There was no admitted debt, as seems true of some cases which are deemed without analysis to be analogous. Purdom had been a tenant on appellant's farm. He put into a barn about September three loads of rent corn, estimated to be about twenty bushels to the load. He stayed on the place until the end of the year and had removed to another place some half mile distant from the farm on which he lived during the year, which was located apparently about six miles from where appellant lived. It is perfectly evident that the two men,—appellant and Purdom,—had quarreled over a settlement. Appellant charged Purdom with taking a sink when he moved from appellant's place, and Purdom testified that some of his children had put it on the wagon without his knowledge, and that he took it back to appellant's place upon notification. Appellant testified that a load of his rent corn was missing. Purdom denied having gotten it for himself, but said appellant had some stock over there which he had fed out of appellant's rent corn. Further, and in reply to appellant's statement on the witness stand, which was as follows: "After I got the shoats loaded and started away, I told her to tell her dady that I was going to take the shoats on home with me, and when he brought

the corn back, and come over and settled with me, he could have the shoats," Purdom testified that appellant always wanted to raise a racket wth him every time he saw him, and that he did not want to have any trouble with appellant, and that he was never going over to see appellant about the hogs in question. This testimony was before the jury who saw the witnesses and heard them testify, and also heard the court pointedly submit to them the question as to whether or not, under these facts, they believed beyond a reasonable doubt that at the time appellant took the hogs in question he intended to appropriate them. The jury were the proper arbiters as to what was appellant's intent, and not this court. In Dunn v. State, 34 Texas Crim. Rep., 257, the charge was theft of a horse, and proof was introduced to show that appellant took a horse,—at first to force the owner to offer a reward for its return, but failing to get the owner to offer a reward, Dunn caused or permitted said horse to be killed. The case was not a particle more flagrant a violation of the rights of another man than the one before us. This court held in the Dunn case as follows: "It appears that the purpose here was not for a temporary use, but to hold the property itself until he should be paid for its restoration to the owner, and to that extent he must have intended to have deprived the owner of its value, and to appropriate it, pro tanto, to his own use and benefit; that is, he proposed to appropriate to his own use some interest or value in the horse itself. Musquez v. State, 41 Texas, 226; McPhail v. State, 9 Texas Crim. App., 165. On this phase of the case the court charged the jury, if they believed the defendant took the horse with the intent to deprive the owner of the value of the same until such time as the owner might offer a reward for the return of the horse, and then to return same and get the reward, and that it was his intent not to return same, but to appropriate it to his own use, except in case a reward should be offered, that in such case defendant would be guilty the same as if he had taken the horse without any intention to return it in any event, or in any contingency. On the other hand, they were instructed, if they believed defendant took the horse, but that he did so for the purpose of holding the horse, and getting the reward should one be offered, and without any intention of depriving the owner permanently of the value of same, but with the intention of returning same and getting a reward, or of returning him without a reward, should none be offered, then to find defendant not guilty. These charges presented the issue on this branch of the case certainly as favorably to appellant as he could claim, and left the question

of his intent at the time of the taking to be determined by the jury, and we think the evidence is amply sufficient to sustain their finding as to such intent." In so far as the governing principle on the point at issue is concerned, I can not conceive a case on facts more nearly identical. In the case at bar the trial court charged, as set out in our original opinion, that even though appellant took the hogs, yet if the jury believed, or had a reasonable doubt thereof, that he took them not to steal them but to bring about a settlement with Purdom, and without intention to permanently appropriate them, the jury should acquit, which is almost exactly what was charged in the Dunn case, supra, in which there was a conviction, and an affirmance by this court.

In Young v. State, 34 Texas Crim., Rep., 290, 30 S. W., 238, the facts show that Young, in broad open daylight, as in the case at bar, went to Ousley's house and found him not at home, —as did appellant in this case,—went into Ousley's house, saw a watch, picked it up, went out in the yard, held the watch up, and told a woman, who was washing in the yard, that he had Ousley's watch, had taken it because Ousley would not pay him what he owed him. These facts are again almost exactly as those before us. Young swore on his trial that he believed he had the right to take Ousley's watch to pay what Ousley owed him. The court in that case told the jury that if Young took the watch only to secure the debt due him, they should acquit him of theft. This is substantially what was told the jury in the case before us. In the Young case a verdict of guilty was affirmed by this court.

In Butler v. State, 3 Texas App., 403, the testimony showed that Butler took ten pounds of flour from a barrel of flour belonging to M, took it in the daytime and in the presence of witnesses to whom he said at the time that he had been working for M on Sunday and had gotten no pay, and was taking the flour to pay for his Sunday work. On his trial Butler asked a charge that if the jury found the flour was so taken, they should acquit, which charge was refused, and this court upheld the refusal of such charge, and affirmed the conviction.

In Brooks v. State, 69 Texas Crim. Rep., 366, where a watch was taken, as claimed by the accused, to compel the owner to pay for a bottle of whisky which he said the owner of the watch had broken, this court upheld the conviction, the theory of the accused having been submitted to the jury by the court in his charge. The court told the jury that if appellant took the watch merely for the purpose of holding it until

he was paid for the quart of whisky that had been broken, or if they had a reasonable doubt thereof, they should return a verdict of not guilty. This court held that was a submission of appellant's side of the controversy, and that it submitted appellant's theory so that the jury might fully understand his claim, and that if the jury had believed him they would have acquitted him under this charge. Not having believed him, and not having accepted his explanation, this court affirmed the conviction in the case.

In Fannin v. State, 51 Texas Crim. Rep., 41, where a party drew a pistol on another and compelled the latter to pay money which Fannin claimed was owing to him, this court held that no man had a right to collect a debt by force and threats. In that case it was insisted, on behalf of the accused, that Smith was indebted to the accused, and that the latter had the right by force and violence to compel payment, and that in so taking Smith's money appellant commtted no robbery and did no wrong. In that case we said: "Extreme cases sometime make bad law. At any rate, we are not willing to lay down the proposition that if a man collects a debt by force and threats, and putting in fear, he will not be guilty of robbery. There might be peculiar facts and circumstances which would exonerate him, and which the jury might consider in mitigation of the punishment, but no man has a right, as we understand the law, to take the law in his own hands, and at the point of a sixshooter, putting his debtor in fear of his life or serious bodily injury, collect a debt, however just, and then defend against it, on the ground that the property was not fraudulently taken because appellant owed him the money, and would not pay him. This is more than a simple trespass, and it will be a dangerous doctrine to hold that a man can thus collect his debts. If it was specific property that appellant had a right to, under the circumstances he might use force to get or regain possession of same without being guilty of robbery; and, under the circumstances of this case, where appellant had no right to any specific property, the prosecutor owing him a debt for wages, the amount of which was even controverted, and he smply drew a pistol and made prosecutor pay him what he (appellant) claimed was due, we hold that this was not a good defense, and the court did not err in charging the jury as he did."

We have here a case in which this appellant took the property of another man and carried it six miles away to his home. We have quoted above what he said at the time he took it. We have also quoted what the owner of the property so taken said

when he found his property was gone. We have quoted what the law says in regard to who is arbiter of disputed issues of fact. We have quoted what the judge told the jury, and there is no possible complaint of its absolute correctness as a rule of law applicable to this case. It seems to the writer that it would be a sad day when a court, whose utterances are supreme in criminal matters in this State, lays down a rule by which any man in this State, claiming an indebtedness from another, may go to the latter's premises and take into his possession such property as he may find there that suits him, and carry same to his home, and announce when he takes it into his possession that he is going to keep it until the owner of the property so taken shall come and bring back other property which the taker claims he has lost, and whose loss he merely attributes to the owner of the property which he has taken away with him. I can not conceive the fearful consequences that would seem legitimately to follow from such a course of conduct as would be thus approved and upheld by the opinion of this court. It is fundamentally an inherent wrong to say that because appellena thought there was not as much rent corn in his barn as had been there some months before, hence Purdom had gotten it wrongfully, and that he had the right to go to Purdom's place and by force if necessary take Purdom's property into his possession, with the approval of the opinion of this court of such conduct. Bloodshed and violence would inevitably follow.

The average man will not submit to having his property, about whose title there is no question, taken forcibly from his possession by another man upon no better ground than that the other man asserts a difference between the two as to a wholly different species and kind of property. If the average man knew that the courts were not going to protect his peaceable possession of his property against an invasion of this kind, by punishing the invader, and that he would be relegated solely alone to his own efforts to protect his property, it seems to me that a tremendous incentive would be given to the average man to take his shotgun and protect his property himself.

I respectfully record my dissent in this case.

### ON STATE'S MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—The State, through the district attorney, has filed a motion for rehearing, emphasizing the contention that the intent of the appellant constituted a jury question upon which there was conflicting evidence and that the conflict having been solved in favor of the State, the

reversal of the judgment of conviction was not within the scope of the authority of the Court of Criminal Appeals. The reversal of the judgment by a majority of the court is founded upon the opinion that the record presents no conflict of evidence but that it is apparent that the act of the appellant was a trespass and that there was no intent to steal the hogs.

We are constrained to overrule the State's motion for rehearing, and it is so ordered.

*Overruled.*